Dolores SULEWSKI, Individually, and as Executrix of the Estate of Leonard Sulewski, Deceased, Plaintiff,

v.

FEDERAL EXPRESS CORPORATION, Defendant.

No. 89 CIV 6808 (KC).

United States District Court, S.D. New York.

Oct. 17, 1990.

Melvin I. Friedman, Kreindler & Krein-
dler, New York City, for plaintiff.

Robert E. Hirsch, Bingham Englar Jones
& Houston, New York City, for defendant.

## OPINION and ORDER

CONBOY, District Judge:

On February 18, 1989, a cargo plane of
the Flying Tiger Line crashed in Kuala
Lumpur, Malaysia. The pilot, co-pilot, and
flight engineer were killed, as was Leonard
Sulewski, an aircraft mechanic in the em-
ploy of Flying Tiger. The central question
in this case is whether Mr. Sulewski was
travelling at the time of his death as a
passenger or an on-duty employee of the
airline.

The plaintiff has brought this action
against the defendant Federal Express Cor-
poration, successor in interest to the Flying
Tiger Line ("Flying Tiger" or "Airline") for
compensatory damages for wrongful death
based upon the Warsaw Convention, 49
U.S.C.App. § 1502 note, ("Convention"),
and upon common law negligence. The
defendant has moved for summary judg-
ment pursuant to Rule 56(b), Fed.R.Civ.P.,
asserting in substance that the decedent
was not travelling at the time of his death
as a passenger, as that term is defined by
the Warsaw Convention, but was travelling
on a scheduled flight pursuant to a con-
tract of employment, in the course and
scope of his employment. Worker's Com-
pensation is, according to defendant's
analysis, the exclusive remedy available to
the plaintiff.

The plaintiff has made a cross-motion for
partial summary judgment on the liability
issue, asserting that the decedent was
travelling as a passenger at the time of his
death, that the Warsaw Convention there-
fore applies in this case, and that the Con-
vention's liability limitations do not apply
because, although Mr. Sulewski had not
been issued a passenger ticket, this was
the fault of the Airline.

Certain facts are not in dispute. Leon-
ard Sulewski was a licensed and fully quali-
fied mechanic authorized to perform main-
tenance on and repairs to Flying Tiger air-
craft. As a "maintenance representative,"
he was one of the seven mechanics not
assigned to a permanent ground station
at various airports on Flying Tiger's world-
wide routes, but was assigned to specific
flights to perform necessary safety and
maintenance work as the plane was on the
ground at various locations where no sta-
tion or ground mechanics were employed
by Flying Tiger.

These maintenance representatives used
their homes as a base, from which they
were assigned to duty on specific Flying
Tiger flights. Their salary was based upon
a collective bargaining agreement the Air-
line had with their union. Mr. Sulewski
received a monthly salary plus a $100.00
pay differential for odd hours worked. He
also received a per diem amount for each
day that he was away from home. He
received his salary irrespective of what he
did for the company during the month as
long as he carried out his assigned duties
with respect to the flights to which he was
assigned.

In February, 1989 Mr. Sulewski was as-
signed to Flying Tiger Flight 66, covering
Singapore, Kuala Lumpur, and Hong
Kong, the latter designation having been
substituted for Taipei. He left Los Ange-
les on February 14, 1989 and flew on vari-
ous Flying Tiger aircraft to Honolulu, the
Fiji Islands, Sidney, Melbourne, and Sing-
apore. He left Singapore on February 18,
1989 on Flight 66, destined for Kuala Lum-
pur and finally, Hong Kong. Upon arrival
in Hong Kong, Mr. Sulewski would be de-
briefed and "destaged," and his assign-
ment would have been completed. He
would then have been free to return to his
home on any flight of his choosing, and
even if he had flown on a Flying Tiger

aircraft, he would have been off duty and in a "deadheading" status. Flying Tiger had no maintenance personnel in Kuala Lumpur on February 18, 1989.

The flight left Singapore on that date at 6:04 a.m., local time, with an estimated flight time of 33 minutes. At precisely 6:34.10, as it descended and approached the runway at Kuala Lumpur Airport it struck a ridge line, became engulfed in flames, and was destroyed. The three members of the flying crew and Mr. Sulewski all tragically perished.

A customs document designated "General Declaration," prepared by Flying Tiger at its Singapore base for Flight 66, places the name of Mr. Sulewski in the "crew" and not the "passenger" column. Affidavit of Paul Nowaske, dated May 14, 1990 ("Nowaske Aff."), unmarked attachment. Mr. Sulewski had not been issued a passenger ticket for Flight 66.

An interoffice memorandum dated July 28, 1988 and addressed to all of Flying Tiger's maintenance representatives from their immediate superior refers to their request "to get a *crew* rest" during a particularly difficult flight. Affidavit of T.E. Moore, dated September, 1990 ("Moore Aff."), unmarked attachment (emphasis added).

The parties further agree, *see* Plaintiff's Response to Defendant's Statement Pursuant to Local Rule 3(g), ¶ 6, that Mr. Sulewski's duties during the course of the assigned flight's stopovers at the "off-line" stations included:

1. supervising the aircraft's ground handling and fueling.
2. responsibility for clearance of all log book items.
3. *pre-flight and post-flight inspections when he was joining or leaving the aircraft.*
4. communication to Flying Tiger maintenance control of any change in the airworthiness of the aircraft upon arrival at any location.

Nowaske Affidavit at 3 (emphasis added).

It is therefore apparent that Mr. Sulewski had on-duty employment obligations to Flight 66 from prior to its take-off in Singapore to after its landing in Hong Kong. Indeed, whether in the air or on the ground, the mechanical integrity of Flight 66 was continuously and exclusively his responsibility during the Flight's scheduled progress from Singapore to Hong Kong.

Flying Tiger asserts that while a "maintenance representative's primary function was to provide ground maintenance and repair to the aircraft during the course of the flight . . . if there was an instrument malfunction or some other problem during the in-air portion of the flight to which he was assigned, the role of mechanic would be that of a consultant with the flying crew members." *Id.* at 4. One of the airline's maintenance representatives testified that during the course of flights with maintenance reps aboard ". . . there were times when each and every one of us were called upon to give advice. You would be a damn fool if you didn't." Deposition of John J. Smith, March 19, 1990 at 30–31.

The plaintiff disputes this with the altogether too facile argument that any advice given by the mechanics in flight would be voluntarily offered, and not required by their job description or collective bargaining agreement. According to this view, they had *exclusively* ground duties. See Affidavit of Louis R. Schroeder, President of the Mechanics Union, dated May 20, 1990. The difficulty with this argument is that it is contradicted by the plain and irrefutable reality that a refusal to give professional advice when asked during an air emergency would constitute an abandonment of the safety of the crew and the aircraft *in media res* of the mechanic's on-going obligation to that safety from Singapore to Hong Kong. To insist that an employee whose sole reason for being in Southeast Asia is to keep the aircraft flying has a contract right while on board to withhold his service and qualifications while the ship descends in peril is, to put the matter plainly, incomprehensible and irresponsible.

Flying Tiger also asserts that

"it was the policy of Flying Tiger that the maintenance representatives had to accompany the flight to which they were assigned unless special permission from the company was sought and received. The purpose of the policy was to insure that the maintenance representative would be at the offline station ready to perform his "on ground" duties while the aircraft was being loaded and unloaded so that the flight would remain on schedule. Having the maintenance representative on board the aircraft also protected against situations where the aircraft had to be diverted to an alternate off-line airport because of weather conditions or political unrest." Moore Aff. at 3–4.

The plaintiff disagrees, claiming that a maintenance representative was not required by company policy to be actually on board an airplane which he had been assigned to service when it landed, and that he had the option of arranging separate transportation to the service stop and meeting the aircraft he was obligated to service at its arrival. "Mechanics were not necessarily required to fly with the airplane that we were assigned to service ... it would be incorrect to say that we were 'assigned' to particular flights in the sense that we had no discretion to get to our work site by some other means." Affidavit of Ray Raduziner, Maintenance Representative for Flying Tiger, dated August 29, 1990 at 2–3. A careful reading of Raduziner's evidence makes it clear that he is not disputing Moore's statement of what broad Flying Tiger policy was with respect to mechanics riding the flights they were obligated to service. He asserts only that from time to time exceptions to the policy might be allowed, although he is careful not to claim that such exceptions ever applied to the Far East routes.

The plaintiff also relies upon a portion of the deposition of the supervisor of the Maintenance Reps in which he testified that Mr. Sulewski was performing no inflight crew duties, and had no responsibilities while he was on board the airplane. Deposition of Paul Nowaske, February 13, 1990 at 44–45 ("Nowaske Deposition"). It is clear, however, that Nowaske was referring to the flying or operational crew, with its formal command and rank structure. The plaintiff also points out that a report of the crash circulated by the Airline did not mention Mr. Sulewski when making reference to the crew, Affidavit of Melvin I. Friedman, dated May 14, 1990, Exhibit 9, and that the 747 Operations Manual filed by the Airline with the F.A.A., which sets forth the duties of the crew, says nothing of mechanics. *Id.* Exhibit 10. These references, however, do not really implicate the question of whether Mr. Sulewski was on duty while airborne between Singapore and Kuala Lumpur, or was a passenger pursuing private travel between the two points.

This then is the factual posture of the case on the motion. As is apparent, both parties have devoted much effort to explicating Mr. Sulewski's status as a member or a non-member of the crew. It is fair to say, however, that neither side is asserting that Mr. Sulewski was a member of the flying, or operational crew. The defendant's position, to be precise, is that he was performing no inflight crew duties except to render consultation in the event of an inflight inquiry by the operating crew, but that he was nonetheless an on-duty employee of the airline specifically assigned to Flight 66 exclusively for the purpose of carrying out his mechanic duties, who died in the course and scope of his employment.

The other principal area of factual inquiry by the parties is the question of whether because Mr. Sulewski had been required by the terms of his assignment to service Flight 66 in both Singapore and Kuala Lumpur, he was required actually to board the flight in Singapore for the flight to Kuala Lumpur. Whether or not Airline permission could in theory have been obtained to go to destinations, in general, by alternate means of transportation is quite beside the point and immaterial in light of the unchallenged deposition testimony of Maintenance Representative John Smith:

Q. On the occasion that you were on Flight 66 did you always leave Singapore aboard the 747 and take that particular airplane to Kuala Lumpur?

A. Correct.

Q. Were there occasions somehow or other you got to Kuala Lumpur on your own? Without taking the Flying Tiger airplane?

A. No, it's impossible. By the time of night we got to Singapore it was ten o'clock local. Approximately. The curfew in Kuala Lumpur was early morning, five or six. The layover was only brief at that time. From that time until five o'clock; five o'clock would be alert.

You only have five or six hours in the hotel and you would have to leave. There was no way you could get to Kuala Lumpur. There was no way in there except by bus or train.

Q. There was no commercial flight?

A. Not at the time of the morning. Because of the curfew.

We believe, therefore, that the terms of the assignment to Flight 66 required the mechanic to board and fly with the aircraft from Singapore to Kuala Lumpur, and that this fact is beyond dispute on this record.

*Legal Analysis*

■ The "Warsaw Convention" (formally titled "Convention for the Unification of Certain Rules Relating to International Transportation by Air") concluded at Warsaw, Poland, October 12, 1929, adhered to by the United States, June 27, 1934, 49 Stat. 3000, 3014 (1934) reprinted in note following 49 U.S.C.App. § 1502 (1970), is an International Treaty to which the United States is a party. *Air France v. Sachs,* 470 U.S. 392, 396, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985). Most of the major countries of the world adhere to the Warsaw Convention, including Hong Kong, the intended destination of Flight 66, Singapore, the point of origin for Flight 66, and Malaysia, the intermediate stop for Flight 66. See, *Lee S. Kreindler,* 1 Aviation Accident Law, Section 11.01 (3 at 11–7 (1988). (listing countries which are parties to the Convention). The Convention was intended to cover certain relationships between air carriers and those requiring international transportation. Article 1 sets forth these relationships:

*Article 1*

(1) This convention shall apply to all international *transportation of persons,* baggage, *or goods* performed by aircraft for hire. It shall apply equally to gratuitous transportation by aircraft performed by an air transportation enterprise.

(2) For the purposes of this convention the expression "international transportation" shall mean any transportation in which, according to *the contract made by the parties,* the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention ...

The Warsaw Convention thus applies to all international transportation of persons, baggage or goods performed by aircraft for hire, or their gratuitous transportation. Article 1(2) of the Convention defines "international transportation" as requiring a "contract" of carriage made by and between the carrier and the party requiring the transportation. In the absence of a contract of carriage made by the parties, the Warsaw Convention has no applicability.

■ Article 17 of the Convention, which establishes and defines liability, by its terms applies to passengers.

*Article 17*

The carrier shall be liable for damage sustained in the event of the *death* or *wounding of a passenger* or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking. (emphasis added)

Accordingly, passengers under Article 17 are all "persons" who receive transportation pursuant to a contract of carriage as required in Article I. *In Re Mexico City Aircrash of October 31, 1979*, 708 F.2d 400, 417, n.31 (9th Cir.1983).

■ It is clear, then, that the question whether or not the Convention applies in this case, turns upon whether Leonard Sulewski "was aboard the flight primarily to perform ... [his] employment obligations, so that [he] was not a 'passenger'". *In Re Mexico City Aircrash*, 708 F.2d at 418.

In that case, the three decedent flight attendants had been assigned by their employer to specific flights and not to stations or locations. Two of the flight attendants, Haley and Tovar, were specifically assigned to flight 2605, the flight which crashed. The 9th Circuit held that:

> Decedents Theresa Haley and Regina Tovar were indisputably working as flight attendants on board Flight 2605. Even though Haley and Tovar were in some sense "transported" by the plane, we do not think that they received "transportation" as "passengers" within the meaning of the Convention. The term "transportation" seems to us to require as a minimum that the voyage be undertaken for the principal purpose of moving the individual from point A to point B. In the cases of Haley and Tovar, the voyages were undertaken not for this reason, but for the exclusive purpose of performing employment duties. We conclude that Haley and Tovar were not, therefore, "passengers" aboard Flight 2605, and that the summary judgments in favor of Western on the claims of plaintiffs Haley and Tovar were proper.

*In Re Mexico Aircrash*, 708 F.2d at 417 (footnote omitted).

The other flight attendant, Vikki Dzida, was not specially assigned to flight 2605. Rather she was utilizing flight 2605 to get to her assigned flight. The Court reversed summary judgment granted in favor of the employer as to Dzida, but only as to Dzida.

Not surprisingly, the parties have focused upon the circumstances surrounding the presence on the ill-fated flight in the Mexico City case of flight attendant Dzida. Plaintiff insists that Mr. Sulewski was in very much the same position as Ms. Dzida, arguing he was not assigned to the in-air portion of Flight 66 as such, but only to ground duties at Kuala Lumpur, that his presence on the flight was only incidental and not required as part of his written employment contract or otherwise, and that he performed no crew or indeed even employment functions on the in-air portion of the flight. Flying Tiger argues that unlike Ms. Dzida, Mr. Sulewski was indisputably assigned to Flight 66, that he was on board pursuant to an employment contract and not a contract of carriage, that his job assignment was the aircraft and not the off-line ground locations, that the terms of assignment to Flight 66 required him to board the aircraft and fly from Singapore to Kuala Lumpur, and that his presence in the aircraft was facilitating his employer's transportation of cargo for its customers.

The Court in Mexico City case put the decisive question this way:

> The ultimate inquiry is whether Dzida was on Flight 2605 for the primary purpose of traveling from Los Angeles to Mexico City, so that she was a "passenger," or whether she was aboard the flight primarily to perform (*or to be on call to perform*) her employment obligations, so that she was not a "passenger".

*In Re Mexico Aircrash*, 708 F.2d at 418 (emphasis added). On this formulation, the case supports Flying Tiger's position here.

Plaintiff's reliance upon *Liberty National Life Ins. Co. v. Dobson*, 377 F.2d 861 (5th Cir.1967), is unavailing. This case, which did not implicate the Warsaw Convention, turned on the question of whether Dobson, an Army private who was a qualified operator of infra-red detection equipment, was a "member of the crew" as that term was used in a private insurance policy. Here, of course, the issue is some-

**512**

what different: whether, under the liability provisions of the Warsaw Convention, Mr. Sulewski was riding the flight as an on-duty employee of Flying Tiger. In any case, we observe that Sulewski's duties were critical to the airworthiness of the plane; indeed, the flight could not have proceeded, no less been routinely operated, without the systematic and formal responsibilities of the maintenance representative being discharged, which responsibilities included·flying with the aircraft from Singapore to Kuala Lumpur.

Nor are *Mertens v. Flying Tiger Lines, Inc.*, 341 F.2d 851 (2d Cir.1965) and *Demanes v. United Airlines*, 348 F.Supp. 13 (C.D.Cal.1972) helpful to plaintiff. In the former case the deceased was not an employee of the carrier or on the flight pursuant to any duty obligation to the carrier. In the latter case, the deceased airline employees had been delivered regular passenger tickets and were "deadheading" between Los Angeles and Denver. Unlike Leonard Sulewski, they had no employment duties relating to the flight on which they met their deaths.

■ The parties have expended much energy and ink arguing definitions of "crew," as that term has been used in maritime, immigration, labor and insurance cases. We have not found references to those cases helpful, as usage in law springs from custom and context. As none of those cases dealt with the meaning of the provisions of the Warsaw Convention implicated here, or the unique operational and employment characteristics of the airline industry, we decline to follow them.

■ Summary judgment may be granted only when the moving party can establish, based on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must first look to the substantive law of the case

to determine which facts are material. Only disputes over material facts will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing that no genuine dispute as to material facts exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the opposing party to show that a genuine issue of fact exists. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Ultimately, "[i]n considering the motions, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*).

Under this standard, we find that there are no disputed material issues of fact to be tried in this case. We conclude as a matter of law that under the Warsaw Convention, Leonard Sulewski was not travelling as a passenger during the course of Flight 66 from Singapore to Hong Kong.

Defendant's motion for summary judgment is granted. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.