IN RE AIR CRASH OFF LONG
ISLAND, NEW YORK, ON
JULY 17, 1996.

This Document Relates to: Loffredo 98
Civ. 2129, Steward 98 Civ. 6271.

No. 96 Civ. 7986(RWS).
MDL No. 1161(RWS).

United States District Court,
S.D. New York.

Dec. 14, 1998.

Kreindler & Kreindler, New York, NY
(Steven R. Pounian, Robert J. Spragg, of
counsel), for Plaintiffs.

Haight Gardner Holland & Knight, New
York, NY (Randal R. Craft, Jr., William C.
Brown, III, Alan D. Reitzfeld, Camille R.
Nicodemus, of counsel), for Defendant Trans
World Airlines, Inc.

### OPINION

SWEET, District Judge.

Plaintiffs Robert Jude Loffredo and Mi-
chael Steward (collectively, the "Plaintiffs")
have moved for summary judgment, pursu-
ant to Rule 56 of the Federal Rules of Civil
Procedure, striking each of the affirmative
defenses of defendant Trans World Airlines,
Inc. ("TWA") based on state workers com-
pensation law. Defendant TWA has cross-
moved for summary judgment on the
grounds that Plaintiffs' decedents were not
"passengers" aboard Flight 800 for the pur-
poses of the Warsaw Convention and that
Plaintiffs are therefore limited to remedies
pursuant to state workers compensation law.
For the reasons set forth below, Plaintiffs'
motion is denied, and TWA's motion is grant-
ed.

### The Parties

Robert Jude Loffredo was the husband of
the decedent Elaine F. Loffredo and is the
administrator of her estate.

Michael Steward was the domestic partner
of the decedent Daryl K. Edwards and is the
administrator of his estate.

Plaintiff's decedent Elaine K. Loffredo
("Loffredo") was aboard TWA Flight 800 on
July 17, 1996. At all times relevant to this
action, Loffredo was employed by TWA as a
flight attendant.

Plaintiff's decedent Daryl K. Edwards
("Edwards") was aboard TWA Flight 800 on
July 17, 1996. At all times relevant to this

action, Edwards was employed by TWA as a flight attendant.

Defendant TWA, a Delaware state corporation with its principal place of business in the State of Missouri, operated the aircraft that crashed on July 17, 1996.

### Prior Proceedings

The first complaint in the Southern District of New York relating to the TWA Flight 800 crash was filed on October 24, 1996. By order dated February 19, 1997, the Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407, transferred to this Court all wrongful death cases arising from the crash "for coordinated or consolidated pretrial proceedings." Pursuant to this order, additional cases subsequently have been transferred or assigned to this Court.

Plaintiff Steward filed his complaint on August 22, 1997. Plaintiff Robert Loffredo filed his complaint on March 24, 1998. TWA filed an answer to Steward's complaint on October 6, 1997, and answer to Loffredo's complaint on April 20, 1998. In each answer, TWA asserted affirmative defenses that Plaintiffs' claims were barred by the exclusivity provisions of the Workers Compensation Law.

Plaintiffs filed the instant motion on July 31, 1998. TWA filed its cross-motion on August 14, 1998. Oral argument was heard on September 30, 1998, at which time the motions were deemed fully submitted.

### Facts

On July 17, 1996, TWA Flight 800 departed from John F. Kennedy International Airport in New York for a flight to Paris, France and Rome, Italy. About ten minutes after takeoff, at an altitude of 13,700 feet, the Boeing 747 met with a catastrophic event while over the Atlantic Ocean and crashed into the sea. Tragically, all 230 persons on board perished.

TWA Flight 800 was scheduled to fly from New York City to Paris, France, and, after a 45 minute stop, to continue on as Flight 800 from Paris to Rome, Italy. Loffredo and Edwards were part of a flight crew of 17 members who were assigned to Flight 800 as a "deadheading" crew for the New York–to–Paris leg of the flight and as an "operating" crew for the Paris–to–Rome leg of the flight. That crew, including Loffredo and Edwards, was also scheduled for active duty aboard Flight 853 from Rome to New York, after a 50–hour layover in Rome. The term "deadhead," pursuant to the contract between TWA and its flight attendants, means "the air travel on flight segments on which a flight attendant is not scheduled to actively engage in flight attendant duties as a member of the working crew." Loffredo and Edwards were paid 50% of their regular pay for the deadhead segment of Flight 800. Their deadheading hours also counted towards the maximum consecutive on-duty hours a flight attendant is permitted to work by contract, and this deadheading assignment was therefore designated as "on-duty" time pursuant to a contract between TWA and the flight attendants. However, Loffredo and Edwards did not receive "credit"— the deadheading time was not included within the total hours they were required by TWA to work each month. Loffredo and Edwards were not required to "stand up" on Flight 800, that is, they were not assigned to any active duties.

Loffredo and Edwards were required to deadhead aboard Flight 800 as a condition of their active-duty work assignment on the Paris–to–Rome segment of Flight 800 and their active-duty assignment aboard Flight 853. Loffredo and Edwards and the rest of the deadheading crew were required to be aboard Flight 800 in order for them to be prepared to take on active duty immediately aboard the flight during the Paris–to–Rome leg of the journey. They were not permitted by TWA to travel to Paris for their active-duty work assignment by any means other than aboard that particular flight.

Plaintiffs assert that Loffredo and Edwards were traveling as passengers pursuant to tickets provided by TWA. Plaintiffs note that these tickets required a "signature of passenger" and stated that it was a "passenger's coupon." TWA contends that Loffredo and Edwards were aboard Flight 800 as on-duty, paid employees and were traveling pursuant to non-revenue flight coupons, known as "810 Coupons." 810 Coupons are used under a number of different circumstances

by both TWA employees and their family members. Both Loffredo and Edwards checked the box on her/his 810 Coupon indicating that she/he was flying for company business.

The 810 Coupon provides in relevant part: Transportation furnished hereunder is subject to the rules relating to liability established by the Convention for the unification of certain rules relating to international transportation by air signed at Warsaw, October 12, 1929, unless such transportation is not "international transportation" as defined by said Convention.... Insofar as transportation furnished hereunder is not subject to the rules of said convention or applicable Workman's Compensation Law, the holder agrees to assume all risk of accident and loss of every character, including personal injury, death and loss of damage to property, and agrees that TWA shall not be liable for any such loss, damage, injury or death, whether caused by the negligence of TWA or its agents or otherwise; this waiver of liability is effective for personal travel and vacation travel only.

Plaintiffs allege that after the July 17, 1996 air crash, TWA initiated New York State Workers' Compensation proceedings to "declare that New York compensation law applied" to Loffredo and Edwards. (Plaintiff's Brief at 3). TWA asserts that, in accordance with the requirements of New York State Law, it notified the Workers' Compensation Board of the crash so that the Board could process any employee claims and award benefits as appropriate. An action to determine whether the deaths of Loffredo and Edwards occurred "in the course of employment" is currently pending before the Workers' Compensation Board.[1]

## Discussion

### I. *TWA is Entitled to Summary Judgment*

#### A. *The Standard for Summary Judgment*

A motion for summary judgment may be granted only when there is no issue of mate-

rial fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Rule 56(c), Fed.R.Civ.P.; *Silver v. City Univ.*, 947 F.2d 1021, 1022 (2d Cir.1991). If, when "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991). If, on the other hand, a reasonable finder of fact could return a verdict for the nonmoving party, there is a genuine factual dispute and summary judgment should not be granted. *See Zeevi v. Union Bank of Switzerland*, No. 89 Civ. 4637, 1992 WL 8347, *4 (S.D.N.Y. Jan. 29, 1992). "[T]he trial court's task at the summary judgment stage of litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219 (2d Cir.1994).

### B. *Loffredo and Edwards are Not Passengers within the Meaning of the Warsaw Convention*

■ As noted, Plaintiffs assert that Loffredo and Edwards are clearly passengers under the Warsaw Convention and their survivors have wrongful death claims under the treaty's terms. TWA maintains that Loffredo and Edwards were not passengers since they were acting within the course and scope of their employment at the time of their deaths and, as a result, that Plaintiffs are entitled only to the benefits payable under the applicable state workers compensation laws. Thus, whether a material factual dispute exists in this case turns on the meaning of the term "passenger" in the Warsaw Convention.

The Warsaw Convention (formally titled "Convention for the Unification of Certain Rules Relating to International Transportation by Air") provides in relevant part:

1. In December, 1997, the Workers Compensation Board held that it had no jurisdiction to determine issues pertaining to the Warsaw Convention.

## Article 1

(1) This convention shall apply to all international transportation of persons, baggage, or goods performed by aircraft for hire, it shall apply equally to gratuitous transportation by aircraft performed by an air transportation enterprise.

(2) For the purposes of this convention the expression "international transportation" shall mean any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention.

## Article 17

The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Plaintiffs cite the Second Circuit's ruling in *Sulewski v. Federal Express Corporation,* 933 F.2d 180 (2d Cir.1991), for the proposition that deadheading airline employees are passengers within the terms of the Warsaw Convention. Contrary to Plaintiffs' assertions, however, the Second Circuit did not hold in *Sulewski* that deadheading airline employees are by definition passengers for purposes of the Warsaw Convention. Indeed, the *Sulewski* court stated that a deadheading employee "might" or "could be" a passenger under certain circumstances. 933 F.2d at 184. The Second Circuit did not render a wholesale conclusion, but rather, established a two-part test for determining whether a person is a passenger under the Warsaw Convention. First, a person must be traveling "pursuant to a contract of car-

riage" and, second, "that the carriage be undertaken for the primary purpose either of going from one place to another or for the recreational enjoyment for the journey itself." *Id.* An application of the *Sulewski* analysis to the facts in this case shows that Loffredo and Edwards were not passengers.

Plaintiffs seek to distinguish *Sulewski,* and contend that unlike Sulewski who was a traveling mechanic assigned to perform maintenance on the actual flight that crashed, Loffredo and Edwards had no required duties on the 800 Flight to Paris. The Second Circuit, however, explicitly rejected any rule which would determine passenger status for the purposes of the Warsaw Convention on the basis of whether the employee had any inflight active duties. The Second Circuit held that "even if we were to read [the decision of the Ninth Circuit in] *In re Mexico City Aircrash,* as requiring that an employee have inflight duties to be a non-passenger, we would not adopt such a rule here." *Sulewski,* 933 F.2d at 187.

■ Similarly, Plaintiffs maintain that in contrast to Sulewski, Loffredo and Edwards were issued ticket contracts by TWA. However, whether a carrier issues a ticket to a particular individual is not, by itself, determinative of passenger status. Indeed, the Second Circuit in *Sulewski* held that "passenger status does not depend on whether the carrier issued a ticket to the person for the flight." *Id.* at 183.

Plaintiffs also point to certain language which is printed on the 810 Coupon to support their claim that the Warsaw Convention applies to Loffredo and Edwards. Plaintiffs note that "[t]he ticket contracts drafted by TWA identify both Mrs. Loffredo and Mr. Edwards as passengers and state that the Warsaw Convention applies to their transportation." (Plaintiff's Brief at 6). However, the Second Circuit has held that an airline's designation of an employee as "crew" or "passenger" does not affect the Warsaw analysis: "[t]he location of Sulewski's body in the wreckage does not affect this analysis. Nor do the conflicting post-accident reports labeling a Sulewski as a passenger in some

instances and a crew members in others." *Id.* at 187.

TWA contends that the references to the Warsaw Convention that appear on the 810 Coupon refers only to the "potential applicability" of the treaty. TWA points to the language of the 810 Coupon that provides: "Insofar as transportation furnished hereunder is not subject to the rules of said Convention *or applicable Workman's Compensation Law,* the holder agrees to assume all risk of accident and loss ..." (emphasis added). According to the defendant, this language clearly establishes that TWA merely intended to inform the user of the Coupon that TWA's liability could be limited by the provisions of either the Warsaw Convention or Workers Compensation Law, whichever might be applicable.

TWA's Manager of In–Flight Services, Chris Rhoads ("Rhoads"), has testified [2] that the 810 Flight Coupon is used under a number of different circumstances by both TWA employees and their family members. Arguably, these differing uses of the 810 Coupon could implicate the liability limitations of either the Warsaw Convention or the Workers Compensation Law, depending upon the circumstances and purpose of such travel. The 810 Coupon provides a space in which to designate the purpose of a trip by checking either a box marked "Company Business" or a box marked "Personal Business." The 810 Coupons used by Loffredo and Edwards aboard Flight 800 were each marked "Company Business." TWA asserts that "it is axiomatic that the applicability of any liability limitations would depend upon the circumstances and purpose of a particular trip." (Defendant's Brief at 15).

This reasoning is persuasive. Indeed, the Second Circuit has framed the issue of passenger status as largely a question of the purpose or reason for an individual's presence aboard a flight. *See Sulewski,* 933 F.2d at 186. In *Sulewski,* the Court found that the employee was not a passenger because "the primary reason Sulewski boarded Flight 66 thus was to fulfill his employment obli-

gations ... his pre-existing contract of employment and his work assignment were the reasons he boarded the flight". *Id.* at 185. Although Sulewski was "not a member of the flying, or operational crew," he was required by his employer to be on the plane. *Id.* Thus, "Sulewski was not simply a commuter who had the option of choosing his own mode of transportation to reach his place of employment. Flying Tiger assigned him to specific flights and ... Flying Tiger required him to be on those flights." *Id.; see also In re Mexico City Aircrash,* 708 F.2d 400, 417–418 (9th Cir.1983) (pivotal issue was "whether [the employee] was contractually obligated to be on board [the flight], or whether she was free to choose any method of transport that would get her to [another city] in time to assume her duty assignment. If the latter situation prevailed we believe that [the employee] qualified as a 'passenger' covered by the Convention") (quoted in *Sulewski,* 933 F.2d at 186).

It is not disputed that Loffredo and Edwards were assigned by TWA to deadhead aboard Flight 800 to Paris in order to position them for active duty aboard Flight 800 on the leg from Paris to Rome and subsequently for active duty aboard Flight 853 from Rome to New York. The testimony of TWA's Manager of In–Flight Services establishes, and Plaintiffs do not dispute, that Loffredo and Edwards did not have the option of choosing their own method of transportation to Paris but rather, were required to be aboard Flight 800 as part of their scheduled work assignment:

Q. With respect to international flights, as Flight 800 was a flight to Paris and then to Rome. Is it— when a deadheader is scheduled to work the flight and then be an active crew member on the return flight, is it entirely up to them how they get to Paris, for example? Is it a procedure, as such, that they are booked for that return flight and it's up to them how they get there?

A. No.

2. On June 19, 1998, Rhoads and Vivian Rutigliano, In–Flight Supervisor of Flight Attendants, testified before the New York Workers Compensation Board as to the facts surrounding the assignment of Loffredo and Edwards, to TWA Flight 800.

Q. Could you tell us how it generally works with the scheduling and what their options are, if any?

A. They don't have any options. They have assignments.

. . . . .

Q. If there were a TWA flight, as there was a Flight 800, going to Paris and then continuing to Rome, that was available to transport this flight crew to man the return flight home, they were required to be on that flight?

A. Yes.

Thus, contrary to Plaintiffs' assertions, Loffredo and Edwards were not commuters. Unlike the airline pilots in *Demanes v. United Air Lines*, 348 F.Supp. 13 (C.D.Cal.1972), on which Plaintiffs rely, Loffredo and Edwards were not traveling home aboard a flight of their own choosing, but were instead contractually obligated to be aboard Flight 800.[3] Loffredo and Edwards were required by their work assignment and employment contract to be aboard Flight 800 in order to assume active duty on the Paris to Rome leg of Flight 800. Had Flight 800 landed safely, Loffredo and Edward's duties on that particular tour would have continued as they were required to serve as "operating crew" members aboard Flight 800 from Paris to Rome. As such, the primary purpose of Loffredo and Edwards for being aboard Flight 800 was to fulfill their employment obligations. In view of their assignment to the flight, "it cannot be said that" Loffredo and Edwards "boarded the plane in accordance with a contract of carriage." *Sulewski* 933 F.2d at 185. Like the decedent in *Sulewski*, Loffredo and Edward's preexisting contract of employment and their work assignments were the reasons that they boarded TWA Flight 800. Loffredo and Edwards were not on the flight primarily for the purpose of going from point A to point B, but because their employer required each of them to be on the plane.

Accordingly, there are no disputed material issues of fact to be tried in this case. As a matter of law, Loffredo and Edwards were not traveling aboard TWA Flight 800 as passengers under the Warsaw Convention.

### Conclusion

For the reasons set forth above, TWA's motion for summary judgment is granted, and Plaintiffs' motion for summary judgment is denied.

It is so ordered.

**3.** Plaintiffs' reliance on *In re Mexico City Aircrash*, 708 F.2d 400 (9th Cir.1983), is similarly inapposite. The Ninth Circuit did not "uphold a Convention death claim for a flight attendant who was 'deadheading' to her next work assignment." (Plaintiffs' Brief at 7). In fact, the Ninth Circuit made no decision as to the passenger status of the flight attendant, but, rather, remanded the case for further factual findings that would establish whether she was "on Flight 2605 for the primary purpose of traveling to Los Angeles to Mexico City, so that she was a 'passenger,' or whether she was aboard the flight primarily to perform (or to be on call to perform) her employment obligations, so that she was not a 'passenger.'" *In re Mexico City Aircrash*, 708 F.2d at 418.