**James M. LINSKEY, Plaintiff,**

**v.**

**HEIDELBERG EASTERN, INC., et al., Defendants.**

**No. 77 C 833.**

United States District Court,
E. D. New York.

May 18, 1979.

Brady, Tarpey & Hoey, P.C. by John J. Palmeri, New York City, for plaintiff.

Haight, Gardner, Poor & Havens by James J. Sentner, Jr., John K. Weir, New York City, for defendants.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

Plaintiff, James Linskey ("Linskey"), was an employee of Heidelberg Eastern, Incorporated ("Heidelberg") for 14 years before his discharge on October 31, 1975. In 1961, Heidelberg hired Linskey as an Assistant Treasurer. By 1975, Linskey, then 55 years of age, had advanced to become the Treasurer of Heidelberg. As Treasurer, Linskey was the second highest ranking officer in Heidelberg and was responsible for fiscal affairs. He contends that he was eventually discharged as a result of the discriminatory practices of the defendants.

Heidelberg is a subsidiary of the East Asiatic Company, Incorporated ("EAC, American"). EAC, American is a subsidiary of East Asiatic Company, Limited. ("EAC, Denmark"). Both Heidelberg and EAC, American are domestic corporations doing business in New York. EAC, Denmark is a foreign corporation incorporated under the laws of Denmark.

Linskey commenced this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* Jurisdiction is based on 42 U.S.C. § 2000e–5(f)(3) and 29 U.S.C. § 626(c). He asserts two claims for relief founded on his general belief that Heidelberg, EAC, American and EAC, Denmark discharged him because he was an older American citizen, and not a

Danish citizen. Thus, he bases his first claim on an assertion of national origins discrimination in violation of Title VII and his second claim on a violation of the age discrimination provisions of the ADEA.

Defendants EAC, American and EAC, Denmark now move pursuant to Fed.R. Civ.P. 12(b) and 56 either to dismiss the complaint or for summary judgment. They make three arguments. First, they contend that Title VII and the ADEA do not provide a cause of action against a non-employer. They argue that Heidelberg, as Linskey's immediate employer, is the only party against whom a cause of action could possibly arise. Second, EAC, Denmark contends that an international treaty between Denmark and the United States exempts EAC, Denmark, as a Danish Corporation, from the provisions of Title VII and the ADEA. Third, EAC, American and EAC, Denmark move to strike allegations of the complaint which seek recovery for sex discrimination against women in violation of Title VII.

The court finds that Linskey has stated a cause of action against EAC, American and EAC, Denmark and that the provisions of the Danish-American treaty do not exempt EAC, Denmark from liability. However, Linskey's cause of action does not extend to women and therefore, the court strikes the allegations in the complaint alleging sex discrimination against women.

## I. ARE PARENT CORPORATIONS "EMPLOYERS"?

Title VII prohibits discrimination by an "employer" on the basis of a person's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1). An "employer" is defined in pertinent part as "a person engaged in an industry affecting commerce . . . and any agent of such a person." 42 U.S.C. § 2000e(b). A "person" is defined to include one or more corporations. 42 U.S.C. § 2000e(a). Similarly, the ADEA prohibits age discrimination by an "employer", 29 U.S.C. § 623(a), and defines "employer" in pertinent part as "a person engaged in an industry affecting commerce . . . [and] any agent of such a person."

29 U.S.C. § 630(b). A "person" is defined to include one or more corporations. 29 U.S.C. § 630(a).

EAC, American and EAC, Denmark contend that those provisions extend only to Heidelberg as the immediate employer of Linskey. They argue that EAC, American and EAC, Denmark cannot be considered, together with Heidelberg, as the single employer of Linskey under either Title VII or the ADEA. They claim that the plain meaning of the statutory scheme precludes the assertion that the existence of a parent-subsidiary relationship combined with some degree of corporate control over the subsidiary would allow either EAC, American or EAC, Denmark to be considered Linskey's "employer".

The question presented has produced different results in the courts. Some courts have refused to consider a parent and subsidiary a single employer for these purposes. *See Hassell v. Harmon Foods, Inc.,* 336 F.Supp. 432 (W.D.Tenn.1971), *aff'd,* 454 F.2d 199 (6th Cir. 1972). Others, however, have held a parent corporation responsible for the alleged discriminatory practices under both Title VII, *see Baker v. Stuart Broadcasting Co.,* 560 F.2d 389 (8th Cir. 1977); *Equal Employment Opportunity Comm. v. Upjohn Corp.,* 445 F.Supp. 635 (N.D.Ga.1977), and the ADEA; *see Marshall v. Arlene Knitwear, Inc.,* 454 F.Supp. 715 (E.D.N.Y.1978); *Brennan v. Ace Hardware Corp.,* 362 F.Supp. 1156 (D.Neb.1973), *aff'd,* 495 F.2d 368 (8th Cir. 1974); *Woodford v. Kinney Shoe Corp.,* 369 F.Supp. 911 (N.D.Ga.1973). In light of the remedial nature of the ADEA and Title VII, and the liberal interpretation to be granted accordingly, *see e. g. Marshall v. Arlene Knitwear, Inc., supra,* the court finds that EAC, American and EAC, Denmark, as parent corporations of Heidelberg, can be regarded as one entity for the purposes of this action. Accordingly, the motion to dismiss for failure to state a cause of action pursuant to Fed.R.Civ.P. 12(b)(6) is denied.

EAC, American and EAC, Denmark, move in the alternative for summary judgment pursuant to Fed.R.Civ.P. 56 on this

argument. The basic principles applicable to a motion for summary judgment are well established. In general, for a court to grant the motion, there must be no genuine issue as to any material fact. Fed.R.Civ.P. 56(c); *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317 (2d Cir. 1975). The court cannot try issues of fact, but must determine whether there are factual issues to be tried. *Id.* at 1319–20. In making its determination, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-movant. *Id.* at 1320.

This is not to say that the non-moving party may remain idle. Simple, conclusory statements alleging the existence of a factual issue are insufficient to defeat a motion for summary judgment. *Donnelly v. Guion*, 467 F.2d 290, 293 (2d Cir. 1972). The opposing party cannot withhold its evidence until trial. Rather it must come forward with evidence to support its claim of a factual issue. *Beal v. Lindsay*, 468 F.2d 287 (2d Cir. 1967); *Donnelly v. Guion, supra*.

■ There are two bases upon which Linskey may seek to establish the liability of EAC, American or EAC, Denmark for the actions of Heidelberg. *Equal Employment Opportunity Comm. v. Upjohn Corp., supra* at 639. If Linskey meets his burden of alleging a material issue of fact under either test, then summary judgment would be inappropriate, regardless of the test ultimately used at trial.

First, Linskey may seek to prove that the activities between and management of the parent corporation and its subsidiary were so closely related as to constitute an integrated enterprise. This test utilizes the National Labor Relations Board's "single employer" standards. *See Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965). Under this test, the following factors are controlling: (1) interrelation of operations, (2) common management, (3) common control of labor relations, and (4) common ownership or financial control. *Baker v. Stuart Broadcasting Co., supra* at 392 (Title VII); *Marshall v. Arlene Knitwear, Inc., supra* at 719 (ADEA).

Second, if a parent corporation so controls the subsidiary as to cause the subsidiary to become merely the agent or instrumentality of the parent, then the parent may be liable under the ADEA or Title VII for the discriminatory employment practices of the subsidiary. *Woodford v. Kinney Shoe Corp., supra* at 916 (ADEA); *Equal Employment Opportunity Comm. v. ISC Financial Corp.*, 14 EPD ¶ 7729 (W.D. Mo.1977) (Title VII).

■ Here, there is a material issue of fact concerning the status of EAC, American or EAC, Denmark to Heidelberg which cannot be decided at this time, regardless of the test used. Linskey has submitted a number of documents which tend to indicate more than a casual relationship between the corporations. For example, the interrogatories produced indicate that various employees of Heidelberg and EAC, American are considered employees of EAC, Denmark as well. Heidelberg employees also participated in training programs sponsored by EAC, Denmark. Moreover, the local management of Heidelberg may request employees from EAC, Denmark, and in turn, EAC, Denmark had the absolute privilege of appointing employees to Heidelberg. In one instance, EAC, Denmark appointed the president of Heidelberg. Defendants have failed to rebut the implications of these factors. Accordingly, the court finds that a material issue of fact exists as to whether EAC, American, EAC, Denmark and Heidelberg are in fact one entity under either of the two standards. Therefore, the motion for summary judgment must be denied.

## II. DOES THE DANISH–AMERICAN TRADE AGREEMENT EXEMPT EAC, DENMARK?

EAC, Denmark moves to dismiss on the ground that the Treaty of Friendship, Commerce and Navigation with Protocol between the United States of America and the Kingdom of Denmark, (1951) 12 U.S.T. 908, T.I.S. 4797, 421 U.N.T.S. 105 ("The

Treaty"), expressly exempts EAC, Denmark from the provision of Title VII and the ADEA. In support of this contention, EAC, Denmark relies on Article VII(4) of the Treaty. That provision provides:

> Nationals and companies of either Party shall be permitted to engage, within the territories of the other Party, *accountants* and other technical experts, *executive personnel*, attorneys, agents and other specialized employees of their choice, *regardless of nationality.* Moreover, such nationals and companies shall be permitted to engage accountants and other technical experts regardless of the extent to which they may have qualified for the practice of a profession within the territories of such other Party, for the particular purpose of making examinations, audits and technical investigations for, and rendering reports to, such nations and companies in connection with the planning and operation of their enterprises, and enterprises in which they have a financial interest, within such territories. (emphasis added)

Thus, EAC, Denmark claims that because it is a Danish Corporation and because Linskey, as Treasurer of Heidelberg, was "executive personnel", its decision to hire only Danish citizens for Linskey's position is justified by the treaty and exempted from the provisions of Title VII and the ADEA.

█ While this defense to a Title VII action is a novel one, the history of the provision belies any claim that a foreign corporation has an absolute privilege to hire professional and other specialized employees of their choice irrespective of the American laws prohibiting employment discrimination.[1] Accordingly, the motion to dismiss is denied.

The Treaty is one of many bilateral commercial[2] treaties involving the United States. The first treaty of this kind was made with France in 1789. *See* 8 Stat. 12 (1789). By the time the treaty between Denmark and the United States came before the Senate for ratification, 130 similar treaties had already been ratified. *Senate Foreign Relations Committee Report on Treaties of Friendship, Commerce and Navigation with Israel, Ethiopia, Italy, Denmark, Greece, Finland, Germany and Japan*, 83d Cong., 1st. Sess. (July 17, 1953). This Treaty is modeled after the first two post-World War II treaties concluded with China and Italy.[3] Thus, while each post-World War II bilateral commercial treaty contains its own unique features, each is based primarily upon the treaties with China and Italy. *See* Wilson, *Postwar Commercial Treaties of the United States*, 43 Am.J. of Int'l L. 262 (1947). As a result of the models used by the United States, more than 25 commercial treaties contain the exact or a substantially similar provision as Article VII(4) relied on by EAC, Denmark.[4]

Despite its frequent occurrence in the commercial treaties, the provision has not been a central topic of discussion in legislative proceedings.[5] Yet, the available legis-

---

1. In the only other case known to this court involving this defense, the court did not reach the merits of that claim. *See Speiss v. C. Itoh & Co., Inc.*, No. 75–H–267 (S.D.Tex. Mar. 1, 1979).

2. While the treaties are often labeled "commercial", the subject matter of the treaties extends beyond provisions for the exchange of goods. Moreover, standards for other aspects of concern, such as international law treatment, treatment of nationals, most favored nation treatments and other commitments on a non-contingent basis, will also appear. Wilson, *Postwar Commercial Treaties of the United States*, 43 Am.J. of Int'l L. 262 (1947).

3. The Treaty of Friendship, Commerce and Navigation with Accompanying Protocol with China (1946) 63 Stat. 1300; TIAS 1871; 25 UNTS 69; The Treaty of Friendship, Commerce and Navigation, Protocol, Additional Protocol and Exchange of Notes with Italy, (1948) 63 Stat. 2255, TIAS 1915, 9 Bevans 261; 79 VNTS 171. These two treaties ended the use of the Treaty of Friendship, Commerce, and Rights with Germany. 44 Stat. 2132 (1923), as the model for United States commercial treaties in the post World War I era.

4. These treaties containing provisions similar to Article VII(4) are listed in the annotations to 8 U.S.C. § 1101.

5. For example, an examination of the legislative history of commercial treaties with China, Italy, Columbia, Greece, Finland, Ethiopia, Isra-

lative history prompts this court to find against EAC, Denmark's interpretation.

In 1955, the United States concluded commercial treaties with Haiti and Iran.[6] Article VIII(1) of the Haitian Treaty and the last sentence of Article IV(4) of the Iranian Treaty are substantially similar to Article VII(4) of the Danish Treaty.[7] In hearings before the subcommittee of the Committee on Foreign Relations of the United States Senate on July 13, 1956, the New York City Bar Association's Committee on Foreign Law presented a memorandum on the Haitian and Iranian provisions. The memorandum stated in pertinent part:

> While it is recognized that it is within a country's jurisdiction to enact rules and regulations for the general admission to liberal professions, it should also be noted that a too-restrictive exercise of a country's prerogative in this field may impede the flow of international trade and investments . . . The committee, in summary, believes that a treaty clause permitting the employment of experts of one's own choice and nationality, *regardless of qualification* in such foreign country is highly desirable and important. *Association of the Bar of the City of New York, Committee on Foreign Law, comments on the Treaty of Friendship, Commerce and Navigation between the United States of America and the Republic of Haiti of March 3, 1955, and Iran, of August 15, 1955* (1956). (emphasis added)

Thus, the purpose of these provisions was to exempt specialized employees of foreign countries and companies from the admission requirements of the host country in specialized areas of endeavor. It was not intended to immunize foreigners from claims under the host country's employment discrimination laws.

Further support for this conclusion is drawn from the legislative history of the Treaty of Amity and Economic Relations with Thailand [1965] 23 U.S.T. 1158; TIAS 7378. Article IV(6) of this treaty is similar to Article VII(4) of the Danish Treaty in that it provides:

> Nationals and companies of either party shall be permitted, in accordance with the applicable laws, to engage, within the territories of the other Party, accountants or other technical experts, executive personnel, attorneys, agents and other specialists of their choice.

The Thailand Treaty was presented to the Senate and ratified in 1967. Significantly, the ratification occurred three years after Title VII had passed as part of the Civil Rights Act of 1964. The legislative history does not reveal any discussion concerning the possible conflict between the treaty provision and Title VII. After the public hearings on the treaty, the Senate Foreign Relations Committee reported that it "was unaware of any opposition to the treaty." *Commercial Treaty with Thailand Report from the Report on Foreign Relations,* 89th Cong., 1st Sess. (April 26, 1967). Moreover, the only witness before the Senate Committee hearing, Leonard C. Meeker, the State Department Legal Advisor, spoke in favor of ratification. No reference was made concerning the effect of the Treaty on Title VII, nor were any questions asked in that regard. *Id.* Therefore, the only inference

---

el, Denmark and Germany, provide no clues to the precise meaning of the treaty provision in issue here. Even though each treaty contains such a provision, the legislative reports and accompanying testimony are silent. *See e. g.* Hearing, Before the Subcommittee of the Committee on Foreign Relations United States Senate, 83d Congress, 1st Session, on Treaties of Friendship, Commerce, and Navigation with Israel, Ethiopia, Italy, Denmark, Greece, Finland, Germany, and Japan. July 13, 1953, and Testimony of Department Assistant Secretary of State Linder, Hearings Before the Subcommittee on Foreign Relations, United States Senate, 82 Congress, 2d Session, on Treaty of Friendship, Commerce, and Navigation with Columbia, Israel, Ethiopia, Italy, Denmark, and Germany, May 9, 1952.

**6.** The treaty with Haiti is not in force today. The treaty with Iran is the Treaty of Amity, Economic Relations, and Consular Rights. (1955) 8 UST 899; TIAS 3853; 284 UNTS 93.

**7.** The provision in the Iranian treaty states: "such nationals and companies shall enjoy the right . . . to engage attorneys, agents, accountants and other technical experts, executive personnel, interpreters and other specialized employees of their choice."

to be drawn is that such a provision was not intended to exempt foreign countries and companies from the requirements of Title VII. Since no support for defendant's position is drawn from post-Title VII legal activity, the logical conclusion is that provisions of pre-Title VII Treaties also do not support its contentions.

Moreover, a closer analysis of the Thailand treaty further belies defendant's arguments. Article IV(6) of that treaty provides that "nationals and companies of either party shall be permitted, *in accordance with applicable laws.*" Treaty, *supra.* (emphasis added) Such applicable laws include the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101(a)(15)(E)(i),[8] and State Department Regulations, 22 C.F.R. § 41.40.[9] The treaty provision, in light of these laws allows Thai nationals to assume the "nonimmigrant aliens" classification of the "treaty trader" category under 8 U.S.C. § 1101(a)(15).[10]

The analogy to Article VII(4) of the Danish Treaty is clear. When read in light of the applicable law of the host country, Article VII(4), becomes a vehicle for granting foreign nationals "treaty trader" status.

See e. g. *Nippon Express, Inc. v. Esperdy,* 261 F.Supp. 561 (S.D.N.Y.1968); *Tokyo Sansei v. Esperdy,* 298 F.Supp. 945 (S.D.N.Y.1969). *See also* 1 Gordon & Rosenfield, *Immigration Law & Procedure* § 211 (1978).

Finally, the fact that over 30 commercial treaties [11] with provision similar to Article VII(4) are in force lends further support to the result reached here. A different ruling would provide an unjustified loophole with wide ranging effects for the enforcement of Title VII. Thus, for all of these reasons, defendant EAC, Denmark's motion is denied.

## III. CAN LINSKEY ALLEGE SEX DISCRIMINATION AGAINST WOMEN?

█ Paragraphs 13(i) and 13(k) of the complaint allege that all defendants engaged in discriminatory practices against women. Since plaintiff is a male, he lacks standing under Title VII to present that claim. *See Martin v. Safeway Trails, Inc.,* 5 FEP Cases 1164 (D.C.D.C.1973). Accordingly, defendants' motion to strike these allegations is granted.[12]

**8.** 8 U.S.C. § 1101(a)(15) provides that:
"The term 'immigrant' means every alien except an alien who is within one of the following classes of nonimmigrant aliens
. . . .
"(E) an alien entitled to enter the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which he is a national . . . (i) solely to carry on substantial trade, principally between the United States and the foreign state of which he is a national; or (ii) solely *to develop and direct the operations of an* enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing, a substantial amount of capital."

**9.** § 41.40 Treaty traders.
"(a) An alien shall be classifiable as a nonimmigrant treaty trader if he establishes to the satisfaction of the consular officer that the qualifies under the provisions of section 101(a)(15)(E)(i) of the Act and that: (1) He intends to depart from the United States upon the termination of his status; and (2) If he is employed by a foreign person or organization having the nationality of the treaty country which is engaged in substantial trade

as contemplated by section 101(a)(15)(E)(i), he will be engaged in duties of a supervisory or executive character, or, if he is or will be employed in a minor capacity, he has special *qualifications that will make his services essential* to the efficient operation of the employer's enterprise and will not be employed solely in an unskilled manual capacity."

**10.** Persons qualifying for "treaty trader" status avoid the presumption that they are immigrants. 8 U.S.C. § 1184(b). Accordingly, they are not subject to the quota restrictions placed upon immigrants under 8 U.S.C. §§ 1151–1154, nor subject to exclusion or deportation under many of the grounds applicable to immigrants. *See* 8 U.S.C. § 1102.

**11.** These are listed in 8 U.S.C.A. § 1101.

**12.** Moreover, as noted by defendants, plaintiff did not raise the issue of sex discrimination in proceedings before the Equal Employment Opportunity Commission ("EEOC") prior to the institution of this action. In several Title VII cases when the complaints included but was not limited to the charge or charges filed with the EEOC, courts have stricken the new charges. *Looney v. Commercial Union Assurance Companies,* 428 F.Supp. 533, 553 n. 3

In conclusion, defendants' motion to dismiss the complaint against EAC, American and EAC, Denmark is denied. The motion to strike allegations of sex discrimination is granted.

So ordered.

(E.D.Mich.1977) (citations omitted). It is sufficient however, for present purposes to rule only that plaintiff lacks standing under Title VII with regard to the sex discrimination allegations.