**Richard KENNEL, Plaintiff,**

v.

**DOVER GARAGE, INC., Defendant.**

**No. CV–89–812 (RJD).**

United States District Court,
E.D. New York.

March 18, 1993.

**180**

Eugene Prosnitz, New York City, for plaintiff.

Merril A. Mironer, Rosenman & Colin, New York City, for defendant.

### MEMORANDUM AND ORDER

DEARIE, District Judge.

Plaintiff Richard Kennel brings this action against his former employer under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., seeking recovery for alleged age discrimination on theories of both disparate treatment and disparate impact. Kennel also alleges a parallel state law age discrimination claim under N.Y.Exec.Law § 296 et seq.[1] On the federal ADEA claim, Kennel seeks to be reinstated to his former position with back pay and applicable benefits; on the state law claim,

he seeks back pay with benefits, plus compensatory and punitive damages. For the reasons that follow, defendant's motion for summary judgment is granted.

Plaintiff was employed by defendant Dover Garage, Inc. ("Dover"), from 1979 until his discharge in April of 1987. Affidavit of Richard Kennel ("Kennel Aff."), dated Apr. 14, 1992, at 1. Plaintiff claims that as a member of a group of "commission" taxi drivers working for Dover—drivers earning wages based upon a percentage of their cab fare bookings—he was treated less favorably and regulated more harshly than a group of "lease" taxi drivers at Dover—drivers who paid a set fee to lease a cab from the garage in exchange for the right to retain all of their bookings. Principally, plaintiff alleges that, beginning in 1987, commission drivers were required to be at work by 6 a.m. every morning to start their day shift, (the "6 a.m. rule"), while the lease drivers were not subject to the same strict starting times. Plaintiff contends that the lease drivers were generally younger than the commission drivers, and that as a result the different shift start requirements imposed upon the two classes of taxicab drivers constitutes unlawful age discrimination. Plaintiff refused to comply with the 6 a.m. rule, and in April of 1987, after several warnings, he was discharged for repeated lateness.

Defendant responds that to the extent the 6 a.m. rule was enforced against the commission drivers, legitimate business reasons existed for this different treatment. The employer paid benefits to the commission drivers that were not paid to the lease drivers, and earned profits in proportion to the commission drivers' bookings; in return the garage expected the commission drivers to start the day shift promptly to ensure maximum cab fare bookings during the morning rush hour. No similar business incentive existed with respect to the lease drivers, who paid to the garage a set daily fee for the use of a cab, regardless of the number of hours they worked or the amount of bookings earned.

---

1. The language of the state provision essentially tracks the language of the ADEA and may be analyzed according to the same legal precedents governing the federal claims.

Defendant further contends that the lease drivers were merely "independent contractors," and not "employees" of the defendant for purposes of the ADEA; therefore, defendant argues, differences in the treatment of commission drivers and lease drivers are insignificant and do not suggest unlawful discrimination. In the alternative, defendant asserts that even if lease drivers are considered "employees" under the ADEA, they entered into their employment relationship and leasing arrangements, not with the defendant, but with its wholly-owned subsidiary, Glenties Leasing ("Glenties"), a corporation that is not a party in this action.

Whether the lease drivers are "independent contractors" or "employees," and whether Glenties is merely the alter ego of Dover, are factual issues that cannot be resolved at the summary judgment stage. However, assuming *arguendo* that the lease drivers were employees, and had entered into their employment relationship with defendant Dover, plaintiff's age discrimination claim will not survive the summary judgment stage for other reasons. With respect to the disparate treatment claim, plaintiff has offered no "significant probative evidence," see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), to support the view that age was a determinative factor in the defendant's decision to discharge him, nor has he offered evidence that defendant's stated reasons for the imposition of the 6 a.m. rule were pretextual. Moreover, at oral argument, upon questioning from the Court, plaintiff essentially acknowledged that the instant claim is most aptly characterized as a "disparate impact" claim. And, as to the disparate impact claim, plaintiff has failed to submit evidence—statistical or otherwise—that establishes that the defendant's regulations or practices had an unlawful discriminatory effect on older, commission drivers in violation of the ADEA.

## Background

This action arises against the backdrop of New York City's transformation of its taxicab industry in the early 1980s. Many of the relevant facts are undisputed. Prior to 1980, taxicab drivers employed by Dover operated as commission drivers only, earning money according to a percentage of their daily bookings. However, following an industrywide acceptance of "lease driving" in New York City—where garages would lease individual medallion cabs to drivers who would then keep their own bookings—Dover offered to their commission drivers the opportunity to elect at any time to become lease drivers with Glenties Corporation, a wholly-owned subsidiary of Dover managing the lease driving arrangements and operating out of the same garage. Under this new leasing system, the garage no longer depended on the productivity of its drivers for revenue. Affidavit of Mark Cohen, dated Dec. 13, 1991 ("Cohen Aff."), at ¶ 9.

This new arrangement was effectuated through a Collective Bargaining Agreement (the "CBA"), between the Metropolitan Taxicab Board of Trade (the "Board"), of which Dover was a member, and the Taxi Drivers and Allied Workers Union, Local 3036 (the "Union"), effective December 1, 1983.[2] After this effective date, Dover hired no new taxicab drivers as commission drivers. Dover's commission drivers were permitted to stay on in their current status, or become lease drivers with Glenties. *See* CBA, Art. XLVII, § 5; Cohen Aff., at ¶ 10. The CBA explicitly established that lease drivers were governed by different rules than the commission drivers. *Compare* CBA, Art. III, § 1 (employer retains right to control, *inter alia*, scheduling, discipline, and the "starting and quitting time and number of hours to be worked" of its employees) *and* CBA, Art. III, § 3 (employer may adopt reasonable rules and regulations to administer work) *with* CBA, Art. III, § 4 ("None of the provisions contained in Section 1 or 3 of this Article III shall pertain to lessees who shall be independent contractors not subject to the direction or control by the Company.").

If a commission driver failed to arrive for his shift on time, that driver would lose the

---

**2.** The Union was the bargaining representative for both the commission and the lease drivers.

CBA, Art. I.

right to a "steady car"—that is, a car guaranteed to him as long as he reported to work punctually or had earlier called to explain any lateness. *See* Deposition of Richard Kennel ("Kennel Depo."), at 241. The commission driver would then have to wait for a car on the "first-in, first-out" basis applicable to the lease drivers. The commission drivers also received certain health, pension, and similar benefits; the lease drivers received none of these additional benefits. Kennel Aff., at 1.[3] In 1981, Glenties requested and received an opinion letter from the IRS stating that the lease drivers were not employees of Glenties for federal income tax purposes. *See* Exh. 2, Letter dated Feb. 25, 1981, attached to Affidavit of Merrill A. Mironer ("Mironer Aff."), dated Dec. 16, 1991.

Defendant Dover employed plaintiff as a taxicab driver from 1979 until April of 1987. Plaintiff drove a cab on the day shift. Prior to January of 1987, the 6 a.m. start time was not rigorously enforced; in general drivers were only disciplined if they arrived after 7 a.m. Cohen Aff., at ¶ 14. Beginning in January, however, Dover notified the drivers that they would be disciplined for arriving late, and applied this new policy of enforcement strictly when commission drivers arrived after 6 a.m.[4] Plaintiff did not comply with the new policy, and arrived for work repeatedly and intentionally after 6 a.m., see Kennel Depo., at 119; in fact, he never once arrived on time after January 1, 1987. *Id.* at 246; Defendant's Rule 3(g) Statement, at ¶ 15. In his deposition, plaintiff explained that he lived in New Jersey and that in order to arrive before 6 a.m. he would have to get up at 4 a.m. Kennel Depo., at 246–50. Moreover, because he believed that the new policy was wrong and unfair, he refused to adhere to it. *Id.* at 119, 242, 257–58, 278, 279. Mark Cohen, the day shift manager of the garage, sent to plaintiff repeated written warnings regarding his lateness. *See* Cohen Aff., Exh. 3. Additionally, plaintiff was previously suspended for driving an overheated cab on November 12, 1986. *See* Mironer Aff., Exh. 3, at 2.

Plaintiff filed a union grievance protesting, *inter alia,* the November suspension and the enforcement of the 6 a.m. rule against the commission drivers. In early April of 1987, plaintiff received a copy of the Arbitration Award in that proceeding, holding that plaintiff's November suspension was justified, and that plaintiff's "difficulties were brought on [not due to age discrimination, but] by his continued lateness and apparent refusal to accept the fact that an employer, in the absence of a contract bar, may set uniform starting times for shifts." Exh. 3 to Mironer Aff., Award dated Apr. 6, 1987; *see also* Kennel Depo., at 256–57 (plaintiff received copy of award but did not agree with it). Following receipt of the decision, plaintiff continued to arrive late, and after further warning from Cohen was discharged on April 18, 1987. He was forty-six years old.

On June 25, 1987, Kennel filed an age discrimination complaint with the Equal Employment Opportunity Commission ("EEOC"). On August 22, 1988, the EEOC issued to Kennel a "right-to-sue" letter. *See* Exh. 5 to Mironer Aff. This action followed.

### Claims

Plaintiff contends that his discharge for excessive lateness was part of a pattern of discrimination against commission drivers he alleges were predominantly older than the lease drivers, and generally over forty years of age. Plaintiff alleges that the defendant unreasonably enforced the 6 a.m. rule against only older commission drivers, and that he purposefully rebelled against the 6 a.m. rule. Kennel Depo., at 242 ("I was at variance with a rule, which, as stated, did not seem to apply to everyone as practice."); *see also id.* at 249 ("I started seriously to question the legitimacy of what was stated in the contract").

---

3. The lease drivers were entitled to Worker's Compensation benefits, however, and in one clause of the CBA they may be considered "employees," "as the term 'employees' is used under the National Labor Relations Act." CBA, Art II., § 1.

4. On January 1, 1987, defendant Dover initiated a lock out, apparently to force all commission drivers to switch to lease driving. Within a week this dispute was resolved with the aid of the Union, and the commission drivers returned to work. Kennel Aff., at 4–5.

Plaintiff has submitted some charts as well as lists to show the average age of commission drivers and lease drivers during various sample weeks prior to plaintiff's discharge. *See* Kennel Aff., Exhs. 1–8. Specifically, plaintiff has compiled data culled from three random weeks during the last 16 months of his employment, based upon index cards and computer printouts received from Dover, Glenties, and the Taxi and Limousine Commission. Kennel Aff., at 2. Plaintiff does not state the reasons for choosing the three particular weeks to compile this information on the average ages of the drivers.

Plaintiff estimates that in these three sample weeks, the average age of the lease drivers was 39, 38, and 41, respectively. Plaintiff also has generated a graph showing the comparative ages of the two groups of drivers at different times during 1986 and 1987, see Kennel Aff., Exh. 8, and has concluded that during this 16–month period "the average age of the commission drivers ranged from 56–66; the average age of lease drivers ranged from 38–41." Kennel Aff., at 4. Plaintiff further has compiled a list of drivers who were still working as commission drivers "some time" in 1986, see Kennel Aff., at 3, & Exh. 1, which reflects their average age as 56. At the end of 1986, there were 15 commission drivers still employed with Dover, fourteen of whom were over 40 years of age. Cohen Aff., at ¶ 12. Since that time, all remaining commission drivers have either switched to lease driving or quit. Kennel Aff., at 6.

### Discussion

Summary judgment may be granted where there is no genuine issue of material fact and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). In reviewing a plaintiff's discrimination claim, the court proceeds cautiously, almost suspiciously, before granting a defendant's motion for summary judgment. Viewing the evidence in the light most favorable to the non-movant, summary judgment is appropriate only if no rational trier of fact could find for the non-movant.

*See Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991).

At the same time, however, the existence of a factual dispute alone is insufficient to defeat a motion for summary judgment; the non-moving party must offer significant probative evidence tending to support its position. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Summary judgment may be entered against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

As a preliminary matter, defendant claims that any comparison between the lease drivers and the commission drivers is flawed because the lease drivers are "independent contractors" with Glenties, rather than "employees" of Dover. To support this argument, defendant points to the terms of the CBA providing for the different treatment and benefits for lease drivers and commission drivers, as well as to the IRS opinion letter stating that lease drivers will not be considered Glenties' employees for federal income tax purposes. Plaintiff insists that both groups of drivers are more appropriately classified as "employees" under the ADEA, and that Glenties is merely the alter ego of Dover.

Both of these issues raise questions of fact sufficient to preclude summary judgment. On the issue of corporate separateness, defendant has come forward with some evidence that Dover was separate from Glenties in that only Glenties handled the lease driving arrangements. The burden thus shifts to the plaintiff "to come forward with persuasive evidence that his claim is not 'implausible.'" *See Binder,* 933 F.2d at 191 (quotation omitted); *see also Linskey v. Heidelberg Eastern, Inc.,* 470 F.Supp. 1181 (E.D.N.Y.1979) (parent and subsidiary corporation single entity for purposes of ADEA where their activities "so closely related as to constitute an integrated enterprise"). Plaintiff has met this burden. It is undisputed that the President and the Manager of both

corporations are the same. Both corporations use the same taxicabs interchangeably, use the same dispatchers, and operate out of the same garage. Both corporations were parties to the same collective bargaining agreement. On this evidence, a reasonable trier of fact could find that an alter ego relationship existed between Dover and Glenties; accordingly, summary judgment on this issue would be inappropriate. *See William Passalacqua Builders, Inc. v. Resnick Developers, Inc.*, 933 F.2d 131 (2d Cir.1991) (corporate disregard is fact issue for jury).

 With respect to the status of the lease drivers, the definition of "employee" found in the ADEA is uninstructive, providing only that an employee is "an individual employed by an employer." 29 U.S.C. § 630(f). In instances, such as here, where the statutory definition is unhelpful, the Supreme Court has established a presumption that Congress "means an agency law definition for 'employee' unless [the statute] clearly indicates otherwise." *Nationwide Mut. Ins. Co. v. Darden,* —— U.S. ——, ——, 112 S.Ct. 1344, 1349, 117 L.Ed.2d 581 (1992) (citing *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)) (for common law definition of "employee" courts should look to general common law of agency rather than the laws of agency of any particular state). Under this standard, a court looks specifically to "the hiring party's right to control the manner and means by which the product is accomplished," *Reid,* 490 U.S. at 751, 109 S.Ct. at 2178, although the extent of control alone is not dispositive. A non-exhaustive list of other factors to consider in this inquiry includes:

(a) the skill required in the particular occupation;

(b) the source of the instrumentalities and tools for the work;

(c) the location of the work;

(d) the duration of the work relationship;

(e) the hired party's discretion over when and how long to work;

(f) the method of payment, whether by time or by job;

(g) whether work is part of regular business of hiring party;

(h) provisions for benefits; and

(i) tax treatment of the hired party.

*Id.* at 751–52, 109 S.Ct. at 2178–79. The existence and degree of each factor is a question of fact, while the legal conclusion to be drawn from these facts is a question of law. *See Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir.1988); *Clancey v. American Mg't Ass'n,* 781 F.Supp. 286, 288 (S.D.N.Y.1992); *Local 777, Democratic Union Organizing Comm. v. N.L.R.B.,* 603 F.2d 862, 906 (D.C.Cir.1978).

Plaintiff correctly notes here that, as pointed out in the IRS opinion letter to Glenties, certain factors such as the right to discharge, the furnishing of tools, and a place to work are all relevant to the determination whether the lease drivers are "independent contractors" or "employees." Plaintiff also correctly observes that the garage's exercise of some management and control over the lease drivers also is pertinent here. *See e.g., City Cab Co. of Orlando, Inc. v. N.L.R.B.,* 628 F.2d 261 (D.C.Cir.1980) (employing general principles of agency law). The provisions of the CBA stating that lease drivers may be "employees" for NLRA purposes, entitled to Worker's Compensation, are by no means characteristic of a typical lessor-lessee business arrangement.[5]

On the other hand, further evidence, including affidavits, various provisions of the

---

5. The plaintiff notes that 29 U.S.C. 152(3) of the NLRA provides that "The term employee ... shall not include ... any individual having the status of the independent contractor," undercutting defendant's argument that the lease drivers are independent contractors despite the fact that the CBA declares that they will be "employees" for NLRA purposes. Defendant's citation to *Local 777, Democratic Union Organizing Comm. v. N.L.R.B., supra,* is not necessarily to the contrary. In *Local 777,* the court stated only that

lessee cab drivers considered "employees" for Workers' Compensation purposes could still be considered "independent contractors" for the purposes of the NLRA. 603 F.2d at 876 n. 38. It did not, however, address the situation here, where instead the CBA provides that the lease drivers shall be considered *both* "employees" for NLRA purposes and independent contractors. Nor did it address in any way the construction of the term "employee" under the ADEA in this context.

CBA mentioned above, the IRS opinion letter to Glenties that the lease drivers will not be considered "employees" for federal income tax purposes, and the April 1987 arbitration award against plaintiff, all indicate that the relationship between Glenties and the lease drivers was established not as an employment relationship, but instead was one between lessor and lessee.

These various factual issues cannot be resolved on summary judgment. Ultimately, however, resolution of these questions is not critical to the disposition of this motion. As analyzed below, even assuming that Dover and Glenties comprise a single corporate entity for purposes of liability, and that the lease drivers are "employees" within the meaning of the ADEA, plaintiff's age discrimination claim must still fail.

1. *Plaintiff's Disparate Treatment Claim*

■■■ The ADEA reads in pertinent part, It shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a)(1). The ADEA specifically provides that an employer legitimately may base a discharge decision on reasonable factors other than age. 29 U.S.C. § 623(f)(1) (1988). A plaintiff establishes a prima facie case of age discrimination by showing that 1) he is a member of a protected age group; 2) he was qualified to perform the duties required by the position; 3) he was discharged; and 4) that the discharge occurred under circumstances giving rise to an inference of age discrimination. *Levin v. Analysis & Technology, Inc.,* 960 F.2d 314, 316–17 (2d Cir.1992); *Hollander v. American Cyanamid Co.,* 895 F.2d 80, 83 (2d Cir.1990) (citing *Pena v. Brattleboro Retreat,* 702 F.2d 322, 324 (2d Cir.1983)).

■■■ In ADEA actions, the parties' respective burdens of proof are the same as under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See, e.g., Levin,* 960 F.2d at 316; *Taggart v. Time, Inc.,* 924 F.2d 43, 45–46 (2d Cir.1991); *Binder,* 933 F.2d at 191; *Montana v. First Fed.*

*Sav. & Loan Ass'n of Rochester,* 869 F.2d 100, 103 (2d Cir.1989). Once a prima facie claim is established, the burden of production shifts to the defendant to articulate a non-discriminatory reason for the discharge. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *see also Binder,* 933 F.2d at 192 (employer must come forward with clear and reasonably specific explanation of decision to discharge). The burden of production then shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the employer's stated reasons are pretextual. *Burdine,* 450 U.S. at 255–56, 101 S.Ct. at 1094–95; *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991); *Binder,* 933 F.2d at 192 (plaintiff must show discrimination "either *directly* by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly* by showing that the employer's proffered explanation is unworthy of credence") (quotation omitted). The burden of *persuasion* rests at all times with the plaintiff. *E.g., Binder,* 933 F.2d at 192.

The plaintiff "need not show that age was the only factor in the employer's discharge decision, but that age was a *determinative* factor." *Levin,* 960 F.2d at 317 (emphasis added); *Hagelthorn v. Kennecott Corp.,* 710 F.2d 76, 86 (2d Cir.1983) ("but for" causation analysis applied to ADEA claims). And, at all times, a district court must tread carefully where intent is at issue, e.g., *Maresco v. Evans Chemetics,* 964 F.2d 106, 113 (2d Cir. 1992), mindful that a plaintiff rarely will be able to submit a "smoking gun" document, as opposed to circumstantial evidence of an employer's discriminatory intent. *See Hollander,* 895 F.2d at 85.

Plaintiff easily meets the first and third elements of a prima facie case: he is a member of a protected group, and was discharged in 1987. However, whether plaintiff was "qualified" to perform the duties of his position poses a more substantial question. Defendant argues that under the terms of the CBA allowing the employer to set reasonable shift start times, the plaintiff was lawfully discharged for "good cause" as allowed under section 623(f)(3) of the ADEA.

Certainly, plaintiff in his deposition concedes that his employer possessed the right to institute whatever start time it wished. Kennel Depo., at 201. By repeated oral and written warnings, day shift manager Mark Cohen warned plaintiff that lateness would not be tolerated, see Exh. 3 to Cohen Aff., and Kennel was aware that he could be fired for lateness. Kennel Depo., at 251. Cohen progressively disciplined Kennel through verbal warnings, written warnings, a written warning accompanied by a temporary suspension, and finally, dismissal. Exh. 3 to Cohen Aff.; *see also* Cohen Aff., at ¶ 13 (appropriate progressive discipline according to Chairman of Metropolitan Taxicab industry involved these four steps). As already noted, even after receiving a copy of an arbitrator's award ruling that he was subject to the 6 a.m. rule, Kennel refused to come to work on time because he disagreed with that portion of the award related to the start time. Kennel Depo. at 257–58, 278, 279. On April 11, 1987, he arrived late and was suspended for one week, with a written warning from Cohen stating, "After repeated warnings you are hereby suspended one week. 4/11—4/17/87 Return to work on Sat 4/18/87 *on time.* Next lateness results in your dismissal." Cohen Aff., Exh. 3. Plaintiff returned to work late on April 18, 1987, and was dismissed.

This evidence of plaintiff's repetitive and intentional lateness supports in some measure defendant's contention that plaintiff was not "qualified" for his position. *See Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 1989 WL 61642 (D.P.R. May 26, 1989) (summary judgment granted to the defendant where plaintiff fired for inadequate job performance, including repeated lateness to work), *aff'd,* 896 F.2d 5 (1st Cir.1990). However, defendant's argument is nonetheless flawed. In maintaining that plaintiff was "unqualified" for his position, defendant mistakenly conflates the question of whether the plaintiff met the employer's job expectations with the separate question of whether those job requirements were legitimate. *E.g., Stein v. McGraw–Hill, Inc.,* 782 F.Supp. 207, 212 (S.D.N.Y.1992) (employer cannot establish employee as unqualified by setting unrealistic standards). Plaintiff, on the other hand, asserts that because the employer's decision to enforce the 6 a.m. rule was not a legitimate job expectation, but a pretext for discrimination, plaintiff was not discharged for "good cause," but was instead qualified for the job and discharged unlawfully. Certainly, on the facts currently presented, *apart* from the repeated lateness, plaintiff was otherwise qualified to perform his duties, and defendant has submitted no significant evidence to suggest otherwise.[6] The question of whether plaintiff was qualified in light of his excessive tardiness ultimately folds into the larger question of whether the employer's strict enforcement of the 6 a.m. rule was a legitimate and non-discriminatory business practice, or a pretext to discriminate against older, commission drivers. Given the problems of proof inherent in discrimination suits, courts must resist any inclination to permit the resolution of the merits to rise or fall on such technical distinctions. Thus, for summary judgment purposes this Court will consider this element of the prima facie case established. *See Owens v. New York City Housing Authority,* 934 F.2d 405, 409 (2d Cir.) (plaintiff only need demonstrate possession of "the basic skills necessary for performance of [the] job;" material issue of qualification may still remain despite some misconduct on the job) (citation omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991).[7]

Accordingly, the last element to be addressed is whether the plaintiff was discharged under circumstances giving rise to an inference of age discrimination. In this regard, plaintiff has offered no specific evidence of age-based animus, direct or circumstantial, nor has he submitted evidence tending to suggest that the defendant's treatment

6. Plaintiff's temporary suspension for an overheated cab in November of 1986 does not change this conclusion.

7. Indeed, even *Medina,* a case upon which the defendant so heavily relies, the panel noted that granting "summary judgment because plaintiff failed to show that his job performance was up to [defendant's] legitimate job expectations ... [is] troublesome." 896 F.2d at 9.

of plaintiff was based upon plaintiff's age, rather than his status as a commission driver. *Compare Levin, supra* (where well-qualified military analyst twelve years older than next oldest co-worker fired for attitude problems, court held prima facie case established and reversed grant of summary judgment where employer allegedly told plaintiff he suffered from memory loss and was "over the hill"; plaintiff also introduced evidence refuting employer's stated budgetary reasons for discharge). Indeed, plaintiff's theory, despite the parties' extensive briefing of the disparate treatment claim, is really one of disparate impact:

> We're not saying that they were motivated by animus for all the people. They were motivated by a desire to get rid of the commission drivers. I think nobody disputes that. But the fact is that their policies had a discriminatory impact upon an older group of people, namely, the commission drivers.

Transcript of Oral Argument, June 5, 1992, at 9. Significantly, plaintiff concedes that everyone in the commission driver category was treated alike, regardless of age. Kennel Depo. at 241, 250, 315–17. All commission drivers were disciplined for arriving late, denied "steady cars" when they did so, and were in general subject to identical disciplinary procedures as the plaintiff. Thus, on plaintiff's own account he was not treated differently *because* of his age.

> Counsel: I guess I'm trying to understand if there was an industry-wide shift to leasing based on economics how there was age discrimination.
>
> Plaintiff: Well, as the system impacted the—the transfer of one system to another impacted on the drivers, the result was that an older age group category worker were treated ·differently as a consequence of the underlying bottom line financial mo-

tivation. Not as a primary but as a secondary effect.

Kennel Depo., at 333. Here again, by his own testimony plaintiff diminishes the strength of his claim, countering any allegation of pretext with his own understanding that age was a factor in the treatment of him or any other commission driver only "coincidentally." Kennel Depo., at 126–27.

Moreover, even assuming the existence of a prima facie showing of discrimination, defendant has satisfied its burden to come forward with a legitimate, nondiscriminatory reason for plaintiff's discharge. They admit that they encouraged commission drivers to become lease drivers, and that the economics of the situation—including various fringe and retirement benefits afforded the commission drivers but not the lease drivers—made the transition from commission driving to lease driving attractive to the defendant. They further explain that the garage did not enforce the same rules and regulations against the lease drivers as against the commission drivers, including the shift start times.[8] Indeed, there was no financial motivation for them to do so—the cab company made the same money on a leased car regardless of the time the driver took the car out of the garage. Since the garage's profits were in part dependent upon the commission drivers' bookings, but not on the bookings of the lease drivers, a financial incentive existed to make sure that commission drivers arrived at the garage and went out on their shift in time for the full morning rush hour. *See* Reply Affidavit of Vincent D. McDonnell, Impartial Chairman of the New York City Taxicab Industry, at ¶ 5 (listing business reasons for enforcement of 6 a.m. rule). Additionally, these differing regulations with respect to the two classes of drivers were memorialized in the terms of the CBA. *See* CBA, Art. III, §§ 1, 3.

8. Manager Cohen stated at various times in his deposition that the 6 a.m. time was enforced against any and all drivers in the garage. Cohen Depo., at 29–32. Later in his affidavit prepared for the Defendant's Reply Memorandum, he says that only the lease drivers were subject to this rule. *See* Cohen Reply Aff., at 3. Despite this discrepancy, the CBA unambiguously provided that the lease drivers were *not* subject to rigid start times; whether or not Cohen thought the 6 a.m. rule applied to all drivers, the plain language of the CBA makes it clear that in fact it did not. *See also* Affidavit of Tom Booth, dated April 28, 1992, at 1–2 (6 a.m. rule selectively enforced against commission drivers only).

For many of the same reasons that plaintiff fails to state a prima facie case of disparate treatment, plaintiff similarly has failed to submit evidence from which a reasonable juror could find that these business reasons were pretextual. Plaintiff must at this stage advance plausible evidence that age was a *determinative* factor in his discharge, and has failed to do so. Plaintiff has testified that the transition to lease driving was undertaken because of economics. Kennel Depo., at 124, 332. Indeed, plaintiff's own stated reasons for remaining as a commission driver are reminiscent of those given by the defendant in support of their decision to enforce the 6 a.m. rule: economic interest. Kennel Aff., at 2. Plaintiff states that the 6 a.m. rule caused him to make less money, because he would be back in the garage before a busier hour in the afternoon. Kennel Aff., at 6. Plaintiff attempts to rebut the defendant's explanations by arguing that there was no real business need for such an early start time, since the rush hour does not peak until 8 a.m. or so. Plaintiff's Rule 3(g) Statement, at ¶ 15. The argument here is that he would make less money by starting his shift earlier, and thus ending his shift earlier; he would cover only the entire morning rush hour, but be prevented from double-shifting to cover the evening rush hour as well. *See* Transcript of Oral Argument, at 16–19, 20–21; *see also* Kennel Aff., at 6. Viewed from this perspective, plaintiff's reason to object to the early shift start time in fact could be said to bolster the employer's position here, since one plausible reason for the strict enforcement of the shift times was to give to the day drivers the advantage of driving throughout the morning rush hour, and to give to the night drivers the equal opportunity to collect bookings during the evening rush hour. Ultimately, this dispute is about money. The fact that this business decision may not have been in plaintiff's best interest simply does not transform it in any way into evidence that the policy was established because of plaintiff's age. In order to satisfy his burden at this stage plaintiff's argument would have to rest implicitly on the

premise that commission drivers would not have been subjected to the same strict regulations had they been younger; plaintiff has produced no evidence of this sort.[9] Significantly, commission drivers remained in their positions as a matter of choice; any Dover commission driver who wished to become a Glenties lease driver could do so at any time. Plaintiff's situation therefore must be distinguished from those cases where, following some company reorganization, older employees involuntarily lose their jobs in favor of the hiring of younger personnel; in this case the reorganization of the taxicab industry and the transition from commission to lease driving resulted in the creation of a new position—the lease driver—available to *all* employees, regardless of age.

On these facts, plaintiff has not submitted evidence from which a rational trier of fact could find for the plaintiff on a disparate treatment theory. Accordingly, summary judgment is granted to the defendant on this claim.

## 2. *Plaintiff's Disparate Impact Claim*

■ As already noted, plaintiff's age discrimination allegation is best characterized as a "disparate impact" claim. Plaintiff's own deposition testimony most clearly articulates this theory. *E.g.*, Kennel Depo., at 333 ("Well, as the system impacted the—the transfer of one system to another impacted on the drivers, the result was that an older age group category worker were treated differently as a consequence of the underlying bottom line financial motivation. Not as a primary but as a secondary effect."). Plaintiff's argument here is simply that the newly enforced start times resulted in an adverse disparate impact upon older drivers who chose to remain commission drivers. Yet plaintiff's disparate impact theory is simply not supported by the statistical or other evidence presented. Summary judgment must be granted to the defendant on this claim as well.

---

**9.** Nor has plaintiff alleged or produced any evidence that the defendant discriminated on the

basis of age against any of the older lease drivers.

■ Seeking to proceed on a theory of discriminatory impact under the ADEA, the plaintiff must advance evidence that a facially neutral employment practice in fact falls more harshly on the members of plaintiff's class, commission taxi drivers, than on the separate group of lease drivers working out of the Dover garage. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977); *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 852–53, 28 L.Ed.2d 158 (1970); *Geller v. Markham,* 635 F.2d 1027, 1030–31 (2d Cir. 1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). To establish a prima facie showing of discriminatory impact, plaintiff must identify the specific employment practice complained of, and then show, "that the practice excluded him or her, as a member of a protected group, from a job or promotion opportunity." *Maresco,* 964 F.2d at 115 (quoting *Waisome v. Port Authority of New York & New Jersey,* 948 F.2d 1370, 1375 (2d Cir.1991)). Typically, disparate impact cases turn on comparisons of relevant applicant pools to the actual person or persons hired or promoted for particular positions, and examine the legitimacy of specific employment practices and criteria used for hiring, promoting or disciplining in these instances. Where the practice has a discriminatory impact on a protected group, and no acceptable business rationale for the practice is advanced, it is illegitimate regardless of purpose or intent.

■ Statistics may be a competent means of establishing a prima facie case of discrimination in the disparate impact context. *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988) ("the evidence in these 'disparate impact' cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities"); *Teamsters,* 431 U.S. at 333, 97 S.Ct. at 1853. The validity of statistics must be evaluated on a case-by-case basis; as the Court noted in *Teamsters,* the usefulness of a plaintiff's statistics "depends on all of the surrounding facts and circumstances." *Id.* at 340, 97 S.Ct. at 1857. Practically speaking, a plaintiff needs to submit the same quantum of evidence that is needed to prevail on a disparate treatment claim, that is, the statistics or other evidence must be "functionally equivalent to intentional discrimination." *Watson,* 487 U.S. at 987, 108 S.Ct. at 2785. Statistics may be probative where they reveal "a disparity so great that it cannot be accounted for by chance." *See Waisome,* 948 F.2d at 1375 (citing *Bridgeport Guardians, Inc. v. City of Bridgeport,* 933 F.2d 1140, 1146 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 337, 116 L.Ed.2d 277 (1991)); *see also Lopez v. Metropolitan Life Ins. Co.,* 930 F.2d 157, 159–60 (2d Cir.) (work force imbalance, standing alone, insufficient to demonstrate discriminatory impact), *cert. denied,* —— U.S. ——, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991):

It is also preferable, although not essential, for a plaintiff to present evidence other than sheer statistics to support a disparate impact claim, to "bring the cold numbers convincingly to life." *Teamsters,* 431 U.S. at 340, 97 S.Ct. at 1857. In this case, however, plaintiff has submitted no significant probative facts. Plaintiff submits that all commission drivers were treated more harshly than the lease drivers in various ways other than the enforcement of the shift start time, yet he fails to document this group-wide unfairness. *See, e.g.,* Kennel Aff. at 7–8 (describing instances of disciplinary actions against commission drivers and conclusorily asserting similar disciplinary actions not taken against lease drivers); Plaintiff's Rule 3(g) Statement, at ¶¶ 16–17 (stating generally commission drivers subject to more severe sanctions for minor infractions and had more difficulty in obtaining needed repairs for their cabs).

Plaintiff's disparate impact theory thus focuses principally on the garage's enforcement of the 6 a.m. rule against commission drivers only, a group plaintiff maintains is generally older than the group of lease drivers. Importantly, however, the two types of jobs, lease driving and commission driving, were available to cab drivers of all ages as a matter of choice, not through any selection or hiring criteria. As part of the transition from commission to lease driving, every taxicab driver could elect to be *either* a commission driver or a lease driver. *See* CBA, Art.

XLVII, § 5 (certain time limitations placed only on lease drivers who wish to return to commission driving). Any different treatment arose because of the individual choice of a driver to remain a commission driver and receive benefits accordingly. *See* Kennel Depo., at 126–27. Thus, to the extent plaintiff's disparate impact theory relies upon an alleged age disparity between the two classes of drivers, any age disparity that does exist was created not by the particular employment practices of the defendant, but by the individual choices of the commission drivers, raising the question of whether plaintiff adequately can demonstrate causation between the practice identified and any alleged unlawful impact on older drivers. *See Lopez,* 930 F.2d at 160 (dismissal of Title VII complaint upheld where statistical evidence inadequate, and where other evidence showed that factors other than employer's training practices caused the underrepresentation of blacks in the employer's regional offices).

Irrespective of the issue of causation, however, plaintiff's "cold numbers" in themselves are problematic, particularly in light of the absence of other probative evidence supporting plaintiff's disparate impact theory. *See Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 604 (2d Cir.1986) (discussing usefulness of anecdotal evidence). Even if a comparison of the two groups of taxi drivers were valid, the statistics and calculations forming the basis of plaintiff's claim are less than persuasive. Looking to the totality of the statistical evidence presented, and to the obvious deficiencies in the statistical proof, clearly plaintiff has not advanced a prima facie showing of age discrimination.

Plaintiff offers no more than a strained, and ultimately unconvincing, correlation between the age of the taxi drivers and their employment status. Plaintiff has based his calculations on what he characterizes as a random sampling of drivers from three weeks during one 16–month period his last 16 months of employment with Dover—that he has chosen, without explanation,[10] to demonstrate age disparities between the two groups of taxi drivers. Plaintiff submits that during these sampling periods "the average age of the commission drivers ranged from 56–66." Kennel Aff., at 4, & Exh. 8. With respect to the lease drivers, as the defendant points out, see Defendant's Reply Memo at 11 n. 6, Mr. Kennel has crossed out some lease drivers' names on some of his charts and lists without explaining why. Other lease drivers plaintiff lists as employed by Dover but has no information concerning their ages. *See* Kennel Aff., at 3–4 (documenting total number of lease drivers during each of three weeks examined, as well as total number for whom birth dates are available). It is not disputed that at the end of 1986, 14 out of 15 commission drivers remaining were over the age of 40. Kennel Aff., at 2; Cohen Aff., at ¶ 12.

A district court at the summary judgment stage will credit plaintiff's evidence unless it is wholly unsubstantiated or unsupported. However, even assuming plaintiff's figures are accurate or reliable, they are still insufficient. Relying on plaintiff's random samplings of drivers' ages, the average age of the lease drivers fluctuates between 38 and 41. At best, plaintiff claims discrimination as a member of a protected group in comparison to another group that, by plaintiff's own admission, is comprised, at one point, of members whose average age is also over 40. Plaintiff himself notes that it was "not uncommon" to have a lease driver over 40, see Kennel Depo., at 317, and significantly, at the time of plaintiff's discharge, the average age of lease drivers was apparently 41. That is, by plaintiff's *own* estimation, at his last chosen sampling period in April 1987, both the average age of the "younger" lease drivers and the average age of the commission drivers fall within an age group protected under the ADEA. Plaintiff's theory, at least in part, thus would appear to hinge simply upon the fact that the commission drivers were generally *older* than the lease drivers, irre-

---

**10.** At a minimum, since plaintiff himself alleges that the garage's attempts to pressure commission drivers to switch to lease driving occurred principally between 1985 and 1987, see Plaintiff's Rule 3(g) Statement, at ¶ 9, it would seem that this longer period, from 1985 until the time of plaintiff's discharge in April, 1987, would be the most logical period during which to analyze the 'effects' of the 6 a.m. rule.

spective of any statutory line-drawing for age discrimination purposes. *See, e.g.,* Pl. Rule 3(g) Statement, at ¶ 36 ("... the average age of commission drivers was considerably older than the average age of lease drivers"); *see also* Kennel Aff., at 2 ("The lease drivers were a considerably younger group."). Such an invitation by the plaintiff—either explicit or implicit—that this Court evaluate various sub-groups of individuals over 40 in order to determine whether the defendant's practices constitute discriminatory impact, must be declined. *See Lowe v. Commack Union Free School Dist.,* 886 F.2d 1364, at 1370–74 (2d Cir.1989) (alleging that teachers in their forties preferred over teachers in their fifties: rejecting disparate impact claim as between sub-groups among two protected groups, and suggesting that where one group of individuals over 40 is subject to discrimination in comparison to another group also comprising members 40 years old or above, only claim of disparate treatment may be viable), *cert. denied,* 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990). What was stated in *Lowe,* affirming a district court's dismissal of an ADEA claim, is equally valid here: "To whatever extent [the statistics] demonstrate any 'disparity,' it is not 'sufficiently substantial' to support an inference of discrimination, ... particularly in light of the unreliability of such a small statistical sample." *Id.* at 1372 (citations omitted).

## Conclusion

Accordingly, defendant's motion for summary judgment is granted. The Clerk of the Court shall prepare and file a Judgment in accordance with this Memorandum and Order.

SO ORDERED.